## Commonwealth v. Parks

*Timothy J. Geary*, for petitioners.
*Andrew G. Uncapher, Sr.*, for respondent.

HOUSE, *P. J.*, May 16, 1979—The son and two daughters of 88-year-old J. Bratton Parks seek by this petition for writ of habeas corpus to compel their stepmother to permit them to visit their father who is non compos mentis and unable to communicate verbally.

They also seek to visit with 94-year-old Jessie V. Parks, their aunt, who is also non compos mentis but able to communicate verbally.

Both of these invalids are virtually confined to bed and are cared for by the respondent-wife-stepmother in the home owned by J. Bratton Parks, where respondent has lived for 35 years.

After full hearing, including evidence of the guardian ad litem appointed sua sponte by the court, the matter is ready for determination.

## DISCUSSION

Neither counsel nor the court have found any similar cases in Pennsylvania and so, it appears, we are dealing with a case of first impression.

The only case cited by petitioner's counsel which seems to involve a somewhat similar issue is Granger v. Johnson, 367 A. 2d 1062 (R.I. 1977).

In Granger, a son filed a petition for writ of habeas corpus seeking to enjoin his mother's husband from preventing the mother from visiting in the son's home. While much of the opinion in Granger is concerned with technicalities of pleading and form of action, the Rhode Island court does

discuss and analyze the facts and law of several cases from other jurisdictions on the merits.

We are particularly struck by the dissents in Granger.

A search of the statutes as well as the reported decisions of the courts of this Commonwealth fails to reveal that the legislature or the courts have ever recognized or established that an adult child has a judicially enforceable right to the company and companionship of a parent. We conclude that no absolute right exists.

Therefore, if petitioners are to be successful here they must establish: (1) That their father and their aunt desire to have the company and companionship of petitioners; and (2) that respondent stepmother is arbitrarily and unreasonably frustrating the desires of her husband and sister-in-law.

Now the fact is that respondent is the wife of J. B. Parks and the sister-in-law of Jessie V. Parks. She and J. B. Parks have been married 35 years and have resided throughout this period in a home owned solely by J. B. Parks. J. B. Parks' sister, Jessie V. Parks, who is 92 years of age, formerly maintained her own residence but has resided with her brother and respondent for a number of years. Both J. B. Parks, who is 88 years of age, and Jessie V. Parks are virtually completely confined to bed and both have been declared incompetent by this court with corporate guardians appointed for their estates.

Respondent, Mae C. Parks, herself an elderly but physically and mentally competent and active person, has for some years provided complete day in and day out care and concern for the two invalids in her marital home. In providing this care, she has the assistance of a medical doctor, members of the

visiting nurses association and household help. Both incompetents have estates which have sufficient assets to provide such financial assistance as is presently necessary.

Petitioners are the son and two daughters of J. B. Parks born of a previous marriage. The son lives in a home within a few steps of the home of his father. One of the daughters lives within a few miles. The other daughter resides at a distance of several hundred miles. All are middle-aged and none except the son has resided in the parental home since reaching adulthood.

It is undisputed, and indeed implicit in the situation, that petitioners and respondent loath and despise each other and that this condition has existed for many, many years.

It is also undisputed that the father, J. B. Parks, and the son were completely estranged for many years. Respondent asserts that this total estrangement existed for at least 12 years prior to July, 1977, while the son admits he did not speak to his father for at least six years prior to July, 1977.

Likewise, the daughter who lives at a considerable distance admitted that she had visited in her brother's home on a number of occasions in years past while her father was compos mentis and that she had not visited her father on those occasions although his home was virtually adjacent.

Only petitioner-daughter who lives in the near vicinity kept up any kind of continuing relationship with her father over the final years of his mental and physical competency.

In May, 1977, respondent here filed a petition to have Jessie V. Parks declared incompetent and a guardian appointed for her estate. On June 29, 1977, a decree was entered and Union National

Bank of Pittsburgh was appointed guardian of her estate.

On August 12, 1977, petitioners here filed a petition to have J. B. Parks declared incompetent and a guardian of his estate appointed. This petition suggested the appointment of one of the petitioner-daughters as guardian but, because of the ill-feeling manifested at hearing, the court, on September 28, 1977, appointed Apollo Trust Company as guardian of the estate of J. B. Parks.

Thereafter, on November 4, 1977, petitioners here filed a petition to have a guardian of the person of the incompetent Jessie V. Parks appointed by the court for the avowed purpose of removing the incompetent to a nursing home because of allegedly inadequate care at the hands of respondent. After full hearing and receipt of the report of the guardian ad litem appointed to represent the interests of the incompetent, this court, on March 9, 1978, refused to appoint a guardian of the person and dismissed the petition.

Then, on April 12, 1978, petitioners filed this petition alleging that J. B. Parks and Jessie V. Parks, the incompetents, are being illegally restrained by respondent and asking that respondent be enjoined from interfering with the relationship between petitioners and their father and aunt. Once again the court appointed a guardian ad litem to represent the interests of the incompetents and fixed the matter for hearing.

Upon hearing it developed that respondent has indeed barred petitioners from any visitation with the incompetents. According to respondent she took this action because petitioners were harassing her with multiple legal proceedings; because the visits were upsetting to the incompetents, and be-

cause petitioners used the visits as occasions to harass respondent.

For their part, petitioners produced evidence that they desired social intercourse with their father and aunt. They also produced the testimony of a visiting nurse that the incompetents would welcome and be stimulated by visitors. This witness stopped short, however, of stating that the incompetents would necessarily welcome or be stimulated by visits from petitioners.

The evidence is undisputed that J. B. Parks cannot or will not communicate verbally with anyone. He normally does appear to be alert rather than comatose but he gives no sign of recognition of specific persons.

The evidence is also undisputed that Jessie V. Parks can communicate verbally and that she normally is alert rather than comatose. She, too, does not appear always to recognize specific persons, including respondent who cares for her.

It would appear then that, while visitors might be stimulating for the incompetents, neither the incompetents nor their visitors would be able to engage in any meaningful social intercourse at any significant intellectual level.

It is noteworthy that respondent has not denied the incompetents all visitors. The incompetents' sister, niece and others can and do visit, as do the doctor, nurses, etc.

So what we are called upon to do is to decide whether under these circumstances adult children have a legal right to compel their admission into the presence of their invalid father and aunt over the objection of their stepmother with whom they apparently have never had good relations.

In this modern day when every person, group and

organization demands his or her or its "rights" and when the highest courts of the land seem to have the uncanny ability to bring forth hitherto unknown "rights" from a Constitution almost 200 years old, it is not difficult at all to simply assume that where there is a whim or a desire then there must be a "right" to satisfy that whim or desire. Fortunately, we are not yet to that point although, undeniably, we appear to be approaching it.

And so we must first determine if petitioners here have a "right" which is being violated or denied them by respondent. Do petitioners have the "right" to visitation with their father and aunt?

We conclude that they do not have any such right and so dismiss their petition.

The home where the incompetents are maintained is owned by petitioners' father but it has been the marital home of respondent for 35 years. None of petitioners live in that home and none has lived there in the last 15 years or so. There can be no doubt at all but that J. B. Parks, if he were competent, communicative and desired to do so, could overrule his wife and admit the petitioners to his home.

But J. B. Parks is not competent; he is not communicative. Moreover, we have no evidence of his desires except events far in the past. These past events, if they indicate anything, would seem to indicate that he would not desire visitation with at least one or more of petitioners.

In these circumstances, Mae C. Parks, respondent, has the paramount right to determine who shall and who shall not enter her home. It is her home and it is private property. She is there by right although she does not hold title. As the mistress of the house as well as nurse in residence, Mae C.

Parks has the privilege of determining who are welcome there and who are personae non grata. The law clearly accords a spouse a position superior to that of adult children. See, for example, the intestate laws of this Commonwealth.

Petitioners seem to concede the foregoing but insist that they have a "right" to see their father and an even stronger "right" to see their aunt.

If there is a "right" or "rights" here, petitioners have failed to call our attention to the statute or case which delineates that right. They have cited Granger, supra, but that case holds only that one spouse cannot prevent the other spouse from visiting with a child in the child's home *if the parent desires to do so.* Granger does not hold that a child may invade the private home of a parent or other relative over the objection of the parent's spouse or person legally in charge of the home. And Granger does not address the situation where the parent has not and, indeed, cannot express what his desires are under the circumstances.

In the final analysis, and whether or not petitioners have a "right" to visit with their father and aunt, this court must determine if such visitation would be in the best interests of the incompetents.

Obviously, visitation would be satisfying to petitioners. However, it is doubtful if corresponding satisfaction on the part of the incompetents would be engendered in any measurable sense. Visitation thus would be pretty much a one-way street.

On the other hand, it is apparent that compelled visitation would be very upsetting to respondent. It would simply add to the burden she already shoulders. It is highly unlikely that either petitioners or respondent could endure visitation without utilizing the opportunity for further acrimony.

On balance, we conclude that the law does not compel visitation be granted to petitioners and that the facts of this case are such that visitation would not be in the best interests of the incompetents.

## ADDENDUM

The foregoing opinion was written shortly after the hearing held June 15, 1978. Meanwhile, the court had suggested a possible compromise of the parties' differences. It now appears that both sides rejected any idea of compromise settlement. Neither party reported this fact to the court until the court recently made inquiries to counsel. Moreover, one of the incompetents, J. Bratton Parks, died 60 days or so after hearing, thus mooting the issue of visitation with him.

## ORDER

And now, May 16, 1979, after hearing and for the reasons contained in the annexed opinion, the rule heretofore issued is discharged and it is ordered, adjudged and decreed that the petition for writ of habeas corpus be and is hereby dismissed.